IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENLASHA M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 6320 |
| v. | ) |
| | ) Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner | ) |
| of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Kenlasha M.,[3] applied for Social Security Income benefits on May 18, 2015, alleging she became disabled on May 6, 2015. (R. 191.) After a hearing, an administrative law judge ("ALJ") issued a written opinion denying her application for benefits. (R. 17-26.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 1), making the

---

[1]The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On November 21, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 11.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 25.)

[3]The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants are not anonymous litigants, in that their names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

ALJ's decision the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Plaintiff now asks the Court to remand the Commissioner's decision denying her application (D.E. 16), and the Commissioner has filed a motion asking the Court to affirm the decision. (D.E. 26.) The matter is now fully briefed. For the following reasons, the Court grants Plaintiff's request for remand and denies the Commissioner's motion to affirm.

## I. Administrative Record

Plaintiff was born on March 4, 1980. (R. 25.) She did not finish sixth grade and has never worked a regular job; she received no earnings from 2007 through 2016. (R. 44, 202-03.) From February 2014 through May 5, 2015, Plaintiff was serving time in a Texas jail for assault. (R. 621-22.) Upon her release, Plaintiff lived in Texas with a relative and received medical care from Metrocare. In May and June 2015, she met with a clinician at Metrocare for treatment of her diagnoses of schizoaffective disorder and depression. (R. 622.) Plaintiff presented with withdrawn behavior, blunted affect and fair judgment and insight, and she reported having racing thoughts and seeing visions of powdered footprints. (R. 622, 625-26, 738.) The clinician prescribed risperidone (an antipsychotic used to treat schizophrenia and bipolar disorder), bupropion (an antidepressant) and hydroxyzine (an anti-anxiety medication). (*Id.*) Plaintiff also took medication for high blood pressure, diabetes and nerve pain in her hands (gabapentin). (R. 245.) Plaintiff reported side effects from her medications including dizziness, headaches, nausea and sleepiness. (*Id.*) She indicated that she cared for her hygiene, cleaned her room, did dishes, and prepared simple meals, but she did not go to the store because she could not be around people. (R. 224-26.)

On June 29, 2015, Michael P. Dolan, Ph.D., performed a mental status examination on Plaintiff related to her claim for benefits. Plaintiff reported experiencing auditory and visual hallucinations, racing thoughts, anger, anxiety attacks, trouble sleeping, tearfulness, depression

2

and decreased energy, and she said she was often agitated and easily distracted. (R. 630-31.) Plaintiff stated that she could perform some household duties, but her sister helped with most things, and Plaintiff seldom left her home. (R. 631.) Dr. Dolan observed that Plaintiff's concentration was "poor," her speech was "slow and mumbled, but understood," she was "guarded and gave vague responses," and she was often distracted and played with children's toys during the interview. (R. 631-32.) In addition, he found Plaintiff's mood was apathetic, her affect was labile (characterized by uncontrollable laughing or crying), and she had poor judgment, a below-average fund of knowledge and memory deficiencies. (R. 632-33.) Dr. Dolan listed her primary diagnosis as Bipolar I Disorder, severe, with psychotic features. (R. 633.)

In July 2015, a non-examining state agency consultant opined that Plaintiff had severe mental impairments that caused her mild restriction in her activities of daily living ("ADLs") and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace. (R. 81-83.) Specifically, he found Plaintiff could "understand, remember, and carry out simple instructions, . . . concentrate for extended periods, interact w[ith] others and respond to changes." (R. 85.) Another non-examining state agency consultant found Plaintiff did not have severe physical impairments. (R. 95-96.)

Plaintiff continued receiving regular treatment from Metrocare through June 2016. (R. 764.) In June or July 2016, Plaintiff moved to Chicago with help from the Salvation Army Human Trafficking program. (R. 57.) In Chicago, Plaintiff was assigned a licensed clinical social worker, Jennifer Harvey, to meet with her regularly and provide her with emotional and other support, including assisting her in managing her finances and accompanying her on errands. (R. 62, 64-65, 68.) Plaintiff first lived at Breakthrough Women's Shelter, where she received medical care from Susan J. Erlenborn, M.D., of the Lawndale Christian Health Center ("LCHC"). (R. 975.) On

3

August 2, 2016, Dr. Erlenborn filled out a "Physician's Statement," listing Plaintiff's diagnoses as schizoaffective disorder, bipolar type, and post-traumatic stress disorder ("PTSD"), and she checked a box indicating Plaintiff was unable to work due to her disability. (R. 1050.)

On September 23, 2016, Dr. Erlenborn noted Plaintiff had not been taking her medications regularly, and she hoped a pill box would help Plaintiff take them consistently. (R. 978-80.) In addition to medication for asthma, hypertension and diabetes, Plaintiff was prescribed bupropion, risperidone, gabapentin and extra strength acetaminophen. (R. 985-86.) At that visit, Plaintiff's weight was 335 pounds, up 22 pounds since June. (R. 981, 986.) On September 29, 2016, Plaintiff's weight had risen further, and she complained of pain in her wrists and thumbs that made it hard for her to grip and lift things. (R. 984-85.) In addition, Plaintiff's feet were swollen, possibly due to her other impairments or prolonged standing at cooking school.[4] (R. 987.)

On October 4, 2016, Plaintiff's thumb pain was improved with splints, but her weight was up to 351 pounds. (R. 1000.) Dr. Erlenborn's psychological examination showed Plaintiff was sleepy but cooperative, with a slightly depressed affect and normal attention span and concentration. (R. 997-98.) The doctor noted Plaintiff was taking her antipsychotic medication regularly. (R. 999.) On October 20, 2016, Dr. Erlenborn recommended Plaintiff discuss with psychiatry changing to a different antipsychotic due to her marked weight gain. (R. 1007.)

In December 2016, Plaintiff moved to subsidized housing at Marah's,[5] but she continued to be treated by Dr. Erlenborn at Breakthrough. (R. 1115, 1021.) On December 5, 2016, Plaintiff met with psychiatrist, Medeia Gartel, M.D., at Sinai Psychiatry and Behavioral Health. Dr. Gartel

---

[4]Plaintiff testified that she participated in Inspiration Kitchen. (R. 63.) Inspiration Kitchen "helps people . . . affected by homelessness and poverty . . . through the provision of social services, employment training and placement." https://inspirationkitchens.org/about-us/ (last visited Nov. 4, 2019). However, she quit after about two weeks. (R. 63.)

[5]Marah's is a program of "Deborah's Place;" it provides permanent, supportive, subsidized housing for women. https://www.deborahsplace.org/2018/03/23/marahstimeline/ (last visited on Nov. 4, 2019).

4

did not complete a planned psychiatric evaluation because Plaintiff became "verbally confrontational" toward her. (R. 1109-13.) Eventually, Plaintiff was rescheduled to have an evaluation with a different psychiatrist on March 3, 2017; she was not interested in therapy because it conflicted with her schooling. (R. 1116.) Later, Sinai called Plaintiff to postpone the psychiatric evaluation to May 2017; Plaintiff got angry and hung up the phone. (R. 1117.)

On December 6, 2016, Plaintiff told Dr. Erlenborn she felt more depressed, had little energy and had difficulty concentrating. (R. 1013.) Plaintiff reported that the medication prazosin was helping her sleep, but she still had occasional flashbacks due to PTSD.[6] (R. 1015.) Dr. Erlenborn increased her dose of bupropion and continued her antipsychotic medications. (R. 1013.) Physically, Plaintiff's wrist and hand pain was mild and intermittent, her diabetes was fairly well-controlled, her hypertension was controlled, and she had lost a few pounds. (R. 1013-14.) However, Plaintiff continued to have foot pain due to flat feet. (R. 1017.) On December 27, 2016, Plaintiff reported that she did not feel any less depressed with the increased bupropion. (R. 1024.)

On March 2, 2017, Plaintiff told Dr. Erlenborn that she was not sleeping well and was waking up "feeling haunted. She gets up to go to the bathroom and then can't go back to sleep - sees men in her room, and smells her prior abuser," and she was "[u]nable to travel on public transportation by herself because she is afraid." (R. 1028.) Dr. Erlenborn noted that Plaintiff often felt depressed, hopeless, anxious, edgy, restless and irritable, and she had trouble concentrating and getting along with other people. (R. 1029-30.) Dr. Erlenborn increased Plaintiff's prazosin at bedtime to address her nightmares from PTSD and referred Plaintiff for a psychiatric evaluation. (R. 1033.) Physically, Plaintiff continued to have pain in her feet, "especially [the] bottoms of her heels that makes it hard to stand and walk in morning," so Dr. Erlenborn ordered custom orthotics

---

[6] Prazosin may reduce nightmares in some people with PTSD. https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/diagnosis-treatment/drc-20355973 (last visited Nov. 4, 2019).

and prescribed extra strength acetaminophen. (R. 1035.) Plaintiff's hypertension and asthma were controlled. (R. 1034, 1028.)

On April 4, 2017, Ms. Harvey arranged for Plaintiff to participate in Growing Home. (R. 58.) Growing Home is a "unique supportive employment model," which provides participants with job readiness classroom lessons, peer support, group therapy, wraparound social services, and job skills at an urban farm. (R. 301, 303.) Plaintiff was supposed to participate about 24 hours per week (R. 303); however, after completing one week in the classroom, Plaintiff did not return to the program after one day at the urban farm. (R. 57-58.) She testified that she had trouble bending down to pick the vegetables, and she did not like having so many people (about 37) standing around her. (R. 57-59.) Plaintiff said "[i]t was just too much" for her. (R. 59.)

On April 10, 2017, Plaintiff received a psychiatric diagnostic evaluation at Cook County Health Systems.[7] (R. 1124.) She was prescribed a new antipsychotic medication (aripiprazole), a new antidepressant (sertraline) and prazosin. (*Id.*)

On May 15, 2017, Kim Davidson, LCSW, the director of clinical services at Deborah's Place (which runs Marah's), wrote a letter "To Whom It May Concern" to "confirm" that Plaintiff:

> regularly participates in meetings with program staff and has worked to improve her health and well being. She has provided verification to medical appointments and meets with the Health Services Coordinator regularly to discuss her progress. She has had four individual appointments over the last few months to discuss her mental health in detail. Through her participation in services, Kenlasha has also demonstrated improved mental health and wellbeing [*sic*].

(R. 1187.) Notes from these individual appointments are not in the administrative record.

## II. Evidentiary Hearing

On May 18, 2017, Plaintiff and Ms. Harvey appeared and testified at a hearing before the ALJ. Plaintiff testified that she heard voices that sometimes told her to hit people and other times

---

[7] The results of this evaluation do not appear to be in the administrative record.

6

told her that people were talking about her. (R. 49-51.) She also stated that she had visual hallucinations; she sees "white powerful steps," birds in her room that keep her "cool," and strange men looking at her. (R. 59-60.) In addition, Plaintiff testified that she had flashbacks where she relived her experiences being trafficked and assaulted, and only sleeps about four hours a night (R. 46, 60-61.) She also felt sometimes that her "mind [was] just going." (R. 46.)

Plaintiff testified that she does not socialize with the other women in her building. (R. 47.) She got into a lot of arguments because "different things irk" her, from people's hair in the sink to people asking her questions that were none of their business (R. 47-48, 52.) Plaintiff preferred to stay in her room. (R. 40-41, 48.) She called Ms. Harvey her "lifesaver;" Ms. Harvey helped her make decisions and accompanied her places so Plaintiff did not have to go by herself. (R. 48-51.)

Plaintiff brought a scented, stuffed bear with her to the hearing, whom she called "Bear." (R. 49.) She explained that he slept with her and went with her everywhere because he helped lessen her anxiety. (R. 49, 61.) Her medications also helped her (R. 60), but they caused frequent diarrhea and urination, constant heartburn and indigestion, and she was very groggy and foggy in the morning, making it hard for her to get up. (R. 37-39, 46.)

Physically, Plaintiff testified that she had sharp pains in her hands, and her fingers sometimes got numb and tingly or stuck. (R. 42-43.) She rated her pain as a seven or eight out of 10 even with gabapentin or extra strength Tylenol. (R. 38-39, 45.) Her feet also got numb and tingly, and her knees and legs were hurting her while she was sitting at the hearing. (R. 42, 54.) In addition, Plaintiff stated that she had to use her inhaler and rest for 10 minutes after walking only three or four minutes. (R. 41-42.)

Ms. Harvey testified that she had provided intensive case management for Plaintiff since Plaintiff moved to Chicago in June 2016. (R. 64.) Ms. Harvey saw Plaintiff usually once per week,

7

to work on Plaintiff's various goals, including getting benefits in order, providing emotional support and providing referrals. (R. 64-65.) Job placement was no longer a goal for Plaintiff because she had tried a few different job programming experiences, but she had "barriers" that made the work hard for her, including physical ailments and problems getting along with other program participants and staff members. (R. 65.) Ms. Harvey explained that due to the trauma in Plaintiff's history, "it is very hard for her to get along with others and to listen to directions, listen to authority. If she becomes triggered or angry, she is often done for the day so to speak." (R. 67.) Ms. Harvey stated that "[o]ften there is a lot of verbal conflict." (R. 68.) In addition, she observed Plaintiff had difficulty concentrating:

> [S]he will space out at times. . . . She often has a lot of racing thoughts. It's very clear there's a switch in talking to her when you can tell she can no longer pay attention to what the other person, including myself, is saying because something has triggered her thoughts.

(R. 65-66.) Ms. Harvey testified that Plaintiff also had trouble understanding verbal and written instructions: "Often she doesn't know what the questions are asking of her. . . .[H]er answers might not align with what the questions are asking." (R. 66-67.)

The vocational expert testified that a significant number of jobs existed for the hypothetical individual the ALJ presented, one who could perform light work with additional physical and mental limitations. (R. 70.) However, the VE testified that if a supervisor had to remind or correct an individual more than three times a day, that could preclude all work because that individual was "not understanding how to perform simple [work]." (R. 71.) In addition, if an individual was off task more than 10 percent of the day, that would preclude all work. (R. 72.)

### III. ALJ's Decision

On October 30, 2017, the ALJ issued a written opinion finding Plaintiff was not disabled since May 18, 2015, the date she filed her application for benefits. (R. 17.) At Step One, the ALJ

found that Plaintiff had not worked at the level of substantial gainful activity since May 18, 2015. (R. 19.) At Step Two, the ALJ determined Plaintiff had the severe impairments of affective disorder, obesity, and schizoaffective disorder (bipolar type). (*Id.*) The ALJ gave "great weight" to the opinion of the non-examining state agency consultant who found Plaintiff's physical impairments were not severe; the ALJ found the opinion was "consistent" with the medical record, which showed Plaintiff's physical impairments were "well controlled with appropriate and conservative treatment, including medication management" and wrist splints. (R. 19-20.)

At Step Three, the ALJ found that Plaintiff's impairments, alone or in combination, did not meet or equal the severity of a listed impairment. (R. 20.) The ALJ made specific findings regarding the "paragraph B" criteria of Listing 12.04 (depressive, bipolar and related disorders), giving "great weight" to the non-examining state agency consultant who opined that Plaintiff could "understand, remember and carry out simple instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes." (R. 21, 24.) The ALJ found this opinion was "consistent with the limited objective findings and conservative treatment of record," as well as with Plaintiff's "24 hours per week" of work at Growing Home and her "considerable" ADLs. (R. 21.) The ALJ found Plaintiff had "moderate" limitation in understanding, remembering or applying information, interacting with others, and concentrating, persisting or maintaining pace, and mild limitation in adapting or managing oneself. (*Id.*) Next, the ALJ stated that "the evidence fails to establish the presence of the 'paragraph C' criteria, as the record does not establish that the claimant has only marginal adjustment, that is, minimal capacity to adapt to changes in [her] environment or to the demands that are not already part of [her] daily life." (*Id.*)

The ALJ assigned Plaintiff a residual functional capacity ("RFC") to perform light work:

> lifting/carrying 20 pounds occasionally and 10 pounds frequently, standing/walking up to six of eight hours, and sitting up to six of eight hours. . . .

9

> [P]ush/pull as much as lift/carry; operate foot controls with the right and left foot frequently; operate hand controls frequently bilaterally; occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; occasionally crawl and kneel; frequently crouch [and] balance . . .; simple, routine and repetitive tasks, but not a production rate pace; simple work-related decisions; occasional interaction with coworkers but no tandem tasks; occasional interaction with the public; must be reminded of task once per day; absent from work one day per month.

(R. 21.) The ALJ stated generally that the RFC "accounted for" Ms. Harvey's testimony about Plaintiff's physical and mental impairments. (R. 24.)

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely consistent" with other evidence in the record. (R. 22.) Specifically, the ALJ found Plaintiff's presentation at the hearing was inconsistent with her allegations because she "ambulated effectively," she "was able to sit through the hearing without any overt pain signs," she "responded appropriately and with adequate memory and concentration to the questions," and "despite allegations of difficulties with others, the claimant appeared comfortable and interacted appropriately throughout the hearing." (R. 23.) In addition, the ALJ found Plaintiff's ADLs were inconsistent with her alleged symptoms and limitations. (R. 23.) The ALJ relied on Plaintiff's self-reported ADLs in 2015 and Plaintiff's "work for about 24 hours per week through Growing Home beginning in April 2017." (*Id.*)

The ALJ also determined that Plaintiff's claims were inconsistent with her "conservative treatment and limited objective findings with appropriate medication management." (R. 23.) The ALJ pointed to a May 12, 2015 report finding that "while the claimant had impaired attention, she had intact memory, full orientation, and fair insight, judgment and impulse control" and a June 10, 2015 appointment finding Plaintiff was "stable." (*Id.*) The ALJ gave great weight to Dr. Dolan's opinion that Plaintiff's symptoms "should improve with treatment," despite noting Dr. Dolan's observations that Plaintiff was "guarded, gave vague responses, reported hallucinations, and had

impaired concentration." (*Id.*) The ALJ also cited a September 2016 report in which Plaintiff described sleeping well and denied hallucinations, and an October 2016 report where she had a slightly depressed affect but normal attention span and concentration. (*Id.*)

The ALJ recognized that Plaintiff's medication was increased in December 2016 "after she reported feeling more depressed with difficulty concentrating and little energy," but the ALJ found that evidence was undermined by Plaintiff's decision not to pursue therapy "because it conflicted with her schooling." (R. 23-24.) The ALJ also found subsequent records showed Plaintiff was "generally stable with appropriate treatment," relying on the May 2017 statement from the director of Marah's indicating Plaintiff "demonstrated improved mental health and wellbeing." (R. 24.)

Lastly, at Steps Four and Five, the ALJ found Plaintiff had no past relevant work, but that based on the RFC the ALJ assigned, she would be able to perform a significant number of unskilled occupations. (R. 24-25.)

## IV. Analysis

The ALJ's decision will be upheld if supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chavez v. Berryhill*, 895 F.3d 962, 967-68 (7th Cir. 2018) (internal citations and quotations omitted). While an ALJ need not address every piece of evidence, the ALJ "must—at minimum—build an accurate and logical bridge from the evidence to h[is] conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018). "Doing so requires the ALJ to consider evidence that undercuts h[is] conclusion." *Id.*

Plaintiff argues, among other things, that the ALJ ignored or misconstrued lines of evidence that undermine the ALJ's determination that she was not disabled, and thus, that the ALJ's opinion was not supported by substantial evidence. The Court agrees for the reasons explained below.

11

### A. Plaintiff's Living Arrangements and Psychosocial Supports

The Court agrees with Plaintiff that the ALJ ignored the fact that she "has lived in a structured living environment during the entire pendency of her claim, but still struggles to adapt to changes in her environment." (Pl.'s Mem. at 6-7.) When evaluating the effects of a claimant's mental disorder, the Social Security regulations require ALJs to "consider the kind and extent of supports [the claimant] receive[s], the characteristics of any structured setting in which [she] spend[s] [her] time, and the effects of any treatment." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00D(1). This evidence includes "psychosocial supports, structured settings, and living arrangements, including assistance from [the claimant's] family or others." *Id.*

When Plaintiff was released from jail in 2015, she lived full time with a relative in Texas. During this time, Plaintiff filled out function reports indicating that she could take care of her personal hygiene, clean her room, make meals and do dishes. (R. 23.) The ALJ called these ADLs "considerable" and opined that they undermined Plaintiff's contention that she was too disabled to work. (R. 21.) However, the ALJ ignored the functional supports Plaintiff relied upon while living in Texas. Although the ALJ noted Dr. Dolan's observations in June 2015 that Plaintiff was "guarded, gave vague responses, reported hallucinations, and had impaired concentration," the ALJ did not acknowledge that Plaintiff told Dr. Dolan that her sister helped with most things. (R. 631.) Because "her sister helped her with most tasks of daily living, . . . her ability to cope with those tasks at home offered little support for her ability to handle competitive full-time work." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). *See also Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (a claimant's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace.") Moreover, the ALJ overlooked

12

Plaintiff's uncontradicted report both to Dr. Dolan and in her function reports that she seldom left her home and did not go to the store because she could not be around people. (R. 224-26, 631.)

Since Plaintiff moved to Chicago in June 2016, there is even more evidence that she could not fully function independently. When she first arrived in Chicago, Plaintiff was moved into Breakthrough Women's Shelter, and she was assigned a social worker, Ms. Harvey. Ms. Harvey has helped Plaintiff tend to her needs on an almost weekly basis since then, so much so that Plaintiff called Ms. Harvey her lifesaver for helping her make decisions and accompanying her places, including to the hearing before the ALJ. However, in his opinion, the ALJ noted only that Ms. Harvey "was a source familiar with the claimant on a regular basis," who testified that Plaintiff "has physical ailments and difficulties with concentration and being around others that make working difficult." (R. 24.) While the ALJ purported to give "some weight" to Ms. Harvey's testimony, the ALJ did not acknowledge the extensive supporting role Ms. Harvey played in many areas of Plaintiff's life. With this omission, the ALJ failed to consider significant evidence that undermined the ALJ's determination that Plaintiff could handle full-time competitive work.

In addition to her continued reliance on Ms. Harvey, when Plaintiff moved to Marah's, she received additional psychosocial supports. The director of clinical services at Deborah's Place (which runs Marah's), Ms. Davidson, explained that living at Marah's included Plaintiff's regular participation in meetings with program staff to discuss her mental health, regular meetings with a health services coordinator to monitor Plaintiff's progress, and verification of Plaintiff's participation in medical appointments. (R. 1187.) However, the ALJ did not acknowledge these additional supports Marah's provided.

All of this evidence that Plaintiff lived in structured settings with extensive psychosocial supports undermines the ALJ's determination that Plaintiff could perform full-time competitive

employment. By ignoring this evidence, the ALJ failed to build the necessary accurate and logical bridge from the evidence to his conclusion. This error requires remand.

## B. Plaintiff's Work Attempts

In addition, the ALJ's reliance on Plaintiff's "work" at Growing Home to support his decision that she could perform full-time work was misplaced. The ALJ repeatedly stated that in April 2017, Plaintiff began working about 24 hours per week at Growing Home. (*See* R. 19, 21, 23, 24.) However, this statement misconstrued the evidence in the record. Ms. Harvey did arrange for Plaintiff to participate in the job training program at Growing Home. However, Plaintiff testified without contradiction that she quit after only one day at Growing Home's urban farm. Indeed, Ms. Harvey stopped trying to assist Plaintiff in finding a job after she failed to complete a few different job programs due to physical ailments and her difficulty getting along with program participants and staff members.

"[T]he ALJ's assertion that [Plaintiff] has succeeded in holding down a . . . part-time job[] stretches the evidence beyond the breaking point. There is a significant difference between being able to work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) (holding that the ALJ improperly rejected the claimant's testimony about the severity of her symptoms based on her ability to work part-time jobs, because the claimant had testified without contradiction that she was fired from one job and quit another job due to symptoms from her mental impairments.)[8] Instead of supporting the ALJ's finding that Plaintiff could perform full-time competitive employment, Plaintiff's experience at Growing

---

[8]Moreover, the Court notes that even if Plaintiff had managed to continue with the job training program at Growing Home, "working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Childress v. Colvin*, 845 F.3d 789, 792-93 (7th Cir. 2017) (internal quotations and citations omitted) (remanding where the claimant lived by himself "but receive[d] lots of assistance in his home from his parents and d[id] very little himself besides sleeping.")

14

Home further undercuts the ALJ's decision. Because the ALJ failed to properly consider this evidence, he failed to build an accurate and logical bridge from the evidence to his conclusion.

## **CONCLUSION**

For the foregoing reasons, the Court grants Plaintiff's request for remand (D.E. 16) and denies the Commissioner's motion to affirm. (D.E. 26.) The Court remands the case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: November 19, 2019**